

Signed and Filed: December 29, 2014

_____
**DENNIS MONTALI**
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>MC2 CAPITAL PARTNERS, LLC,<br><br>        Reorganized Debtor. | ) Bankruptcy Case<br>) No. 11-14366<br>)<br>) Chapter 11<br>)<br>)<br>) |

MEMORANDUM DECISION ON OBJECTIONS TO CLAIMS

I. <u>Introduction</u>

    The court conducted a trial on the objections of debtor, MC2 Capital Partners, LLC ("MC2" or "Debtor"), to the proofs of claim filed by Egan Plumbing Co. ("Egan") (Claim No. 19), Lefco, Inc. ("Lefco") (Claim No. 20), and Berger Brothers ("Berger") (Claim No. 27) (collectively "Claimants") on April 29, April 30, May 1, May 12, May 13, June 3, June 4, August 18, and August 19, 2014. During the course of the trial the court requested that MC2 refine and amend its objections. Accordingly, MC2 filed Amended Objections to the claims of the Claimants on May 23, 2014 (Docket Nos. 594, 595 and 596).

    For the reasons set forth below, the court will sustain the Amended Objections in part and overrule them in part. More specifically, it will allow the proofs of claim as follows:

| Name | Allowed Amount |
|------|----------------|
| Egan | $371,016.85 |
| Lefco | $ 90,663.02 |
| Berger | $637,275.59 |

II. Discussion[1]

**1. MC2 did not need a California general contractor's license to prosecute the Amended Objections, including its assertion of off-sets.**

MC2 is the owner of the property in San Rafael, California that it developed (the "Project"), primarily through a general contract with Monahan Pacific Construction Corporation ("MPCC"). MPCC was, at all material times prior to March 3, 2011, a licensed general contractor. It entered into construction subcontracts with Claimants and numerous other subcontractors at the Project. In December, 2010, MC2, as owner, exercised its contractual right to terminate MPCC as general contractor and to take over the Project and deal directly with all subcontractors, including Claimants, until the end of all work on the Project.

MC2 was never licensed under California contractors license laws, but that is of no consequence. California Business and Professions Code § 7044(a)(2), relied on by Berger and joined by Lefco and Egan, is inapplicable. That provision requires a license to be held by an owner of property under circumstances not applicable to the Project.[2] MC2 did not have a license but MPCC

---

[1] The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052(a).

[2] In relevant part, California Business and Professions Code Section 7044(a)(2) exempts from licensing:

An owner who builds or improves a structure on his or her

-2-

did when it entered into the construction subcontracts with Claimants. When MC2 exercised its right under the applicable contracts to terminate MPCC and assume the obligations to subcontractors, including Claimants, it effectively became directly in contract with licensees who could contract for the work of their respective trades involved. The Project does not involve single family residential structures.

At all times that MPCC performed as general contractor it was licensed; it ceased its function as a general contractor prior to the time its license was suspended. Because the Amended Objections are being prosecuted by an unlicensed owner, the court need not concern itself with what might have happened had MPCC remained in the position of general contractor and attempted to defend the claims asserted by Claimants. Further, even if MC2 needed to have a license, its unlicensed status would not prevent it from defending claims based upon unauthorized, defective or untimely work by Claimants.

**2. The Delta 7 changes were not insignificant.**

The parties differ about whether provisions generally described as the Delta 7 changes were insignificant and thus required the Claimants, as subcontractors on Design-Build subcontracts, to deal with those changes without additional

---

property, provided that both of the following conditions are met:

(A) The owner directly contracts with licensees who are duly licensed to contract for the work of the respective trades involved in completing the project.

(B) For projects involving single-family residential structures, no more than four of these structures are intended or offered for sale in a calendar year.

-3-

compensation.  The court finds from the preponderance of the
evidence presented that the Delta 7 changes were material, thus
justifying additional charges or change orders in favor of
subcontractors, including Claimants.

**3. The retention amounts held by MPCC, that later became potential obligations assumed by MC2, were not in the nature of liquidated damages.**

The court is satisfied that retention percentages, typically 10% (though perhaps only 5% here for Lefco) are withheld from construction contract payments in order to induce the subcontractors to complete each and every aspect of their respective contractual obligations.  Were MC2 to prevail in its characterization of the retentions as liquidated damages, it might have followed that it could claim the retention amounts as to each of the Claimants, assuming performance by those Claimants was not excused for some earlier material breach of their respective subcontract by MPCC or MC2.  Because the court rejects that theory, however, MC2 will only be allowed to look to the retention amounts as security to the extent it has proven actual damages attributable to the respective Claimant.

MC2, itself, recognized the role played by retentions in construction contracts in its Amended Objections.  For example, in its Amended Objections to Claim No. 19 of Egan Plumbing, Inc., at fn. 2, MC2 cited *Cates Construction, Inc. v. Talbot Partners*, 21 Cal. 4th 28, 88 Cal. Rptr.2d 855 (1999) for the proposition that it is common for construction contracts to contain terms that protect an owner's construction funds.  A percentage of funds held until completion of all work is called retainage and is intended to both reduce the risk of nonperformance by the contractor and to

-4-

assure completion of the work in accordance with the contract terms.

MC2 went on to state that retention is essentially "security for the contractor's full and complete performance" citing *Yassin v. Solis*, 184 Cal. App. 4th 524, 535, 108 Cal. Rptr. 2d, 854, 862 (2010).

With the retainage as security it follows that an owner may look to that security only to compensate it for its actual proven damages. The concept of security is inconsistent with the notion that the amount is a liquidated damage fund.

**4. Neither Egan nor Berger may have their claims off-set, in whole or in part, because of delays on the Project.**[3]

The Project was a "Design/Build" undertaking. That concept required subcontractors, including Claimants, to prepare and complete plans for their respective work, certify those plans, and insure appropriate governmental permits. Unlike a more traditional contract, Design/Build contracts impose design, integration and coordination obligations on the subcontractors.

That being said, plainly the overall responsibility for integration and coordination has to rest with MPCC, the general contractor. Here the court is left with the distinct impression that MPCC (and thereafter MC2) failed to provide overall coordination and thus cannot lay the blame for substantial delays on any individual subcontractor, and more particularly here on Egan or Berger.

Apart from the court's overall impression of a lack of organization at the Project, Debtor's expert, Jay Carey, simply

---

[3] Debtor does not assert any delay damages against Lefco.

-5-

failed to convince the court that his analysis carried the
Debtor's burden to impose such a consequence of substantial delay
damages on either of these Claimants. The court will not
disqualify Mr. Carey as an expert, nor fault him for what
Claimants say is the lack of a credible critical path analysis.

Debtor would have the court assess delay damages against Egan
in the amount of $1,206,875 and against Berger in the amount of
$1,535,366.56. The court will not do that, for the reasons stated
above, but also because of a lack of precision in establishing how
to reconcile the conduct of those two subcontractors with the
conduct of MPCC as general contractor and how to award the largest
component of delay, interest accruals, in favor of an owner who
went into default on its obligations to the construction lender
and did not prove what amounts of interest it actually paid that
had accrued on the loan because of delays.

**5. MC2 did not assign its rights to defend Claimants' proofs of claim.**

Berger argues that when MC2 sold the Project to Marin Premier
Residential, LLC, it transferred away all of its related
intangible property, including transferrable guaranties and
warranties and claims for defective and incomplete work.

The court rejects as unpersuasive the idea that by
transferring the Project the representative of a confirmed Chapter
11 estate lost its right to object to claims. In doing so it is
simply defending the proofs of claim to the extent that applicable
nonbankruptcy law would give it a defense under 11 U.S.C.
§ 502(b)(1). It is not seeking any affirmative recovery for
breaches of guaranties or warranties; it is simply opposing, for

-6-

the benefit of all other creditors of this estate, claims that it believes lack merit.

III. Egan'S Claim

Egan's proof of claim No. 19 was filed in the amount of $380,906.85. By stipulation that claim is treated as a net claim of $379,906.85. Further, by stipulation (Docket No. 580), the retention amount potentially in Debtor's favor is $223,537.09.

**1. Change Orders**

The Egan proof of claim includes change orders totaling $152,757.85.[4] In its post-trial brief MC2 challenges only the following change orders relied on by Egan:

| Change Order | Subject | Amount |
|---|---|---|
| 4, REV 2 | Roof Drains | $34,099.65 |
| 16 | Insulation | $16,531.25 |
| 22 | PG&E Connection | $ 1,151.33 |
| 37.5 | Labor Increase | $51,060.00 |
| 28 | Secondary Drain Lines | $22,621.15 |
| | TOTAL | $125,463.38 |

One of the issues discussed at trial and relevant for the other Claimants is whether or not change orders, to be permitted, needed to be signed by Thomas Monahan, the principal of MC2 and MPCC. In its Amended Objection, MC2 argued that the change orders had not been personally approved by Mr. Monahan. Read literally, the subcontracts required Mr. Monahan to sign change orders. But the lack of a signed change order does not mean the Claimants

---

[4] The court cannot reconcile the difference between the net claim and the included change orders ($379,906.85 - $152,767.85= $227,139.20) with the stipulated retention of $223,537.09. The confusion is irrelevant, however, as set forth in the text.

-7-

cannot be paid for work requested by MPCC representatives and which obviously benefitted MPCC and thus MC2. To deny such a recovery under these circumstances would amount to an unjust enrichment at the expense of the performing party. Further in Exhibit UU accompanying the Egan objection, the lack of approval by Mr. Monahan is not identified as a basis for rejection of the five change orders. Thus the court may treat that issue as waived by MC2 as to Egan.

The court will allow Egan all of the disputed change order amounts:

Change Order 4, REV 2 pertains to a change in position of outlet drains on the roofs, moving them from the bottom to the side. MPCC directed the change and MPCC's representative, Mr. Mackim, authorized it. Egan is allowed $34,099.65 as part of its claim.

Insulation of rain-water pipes on horizontal drain line was a change added by the architect on the Project. It was not a code requirement that Egan would have had to comply with at its expense. Mr. Monahan apparently thought that insulation was a luxury item, consistent with the Project. What he thought did not make it part of Egan's contractual obligation. It will be allowed $16,538 on Change Order 16 as part of its allowed claim.

The assembly for the PG&E meter was too low and Mr. Mackim asked for a price for Egan to adjust the connection for the meter. MC2 cannot complain. Egan will be allowed $1,151.33 on Change Order 22 as part of its allowed claim.

Egan bore the risk of a labor increase up to the contractual scheduled deadline for completion of its contract. Because of

-8-

delays that are not attributable to Egan, MC2 must bear the risk of Egan's incurring additional labor charges because the Project took longer than was expected. Egan will be allowed $51,060 on Change Order 37.5 as part of its allowed claim.

Secondary washing machine drain lines to detect leaks in the individual residential units were not part of the original subcontract. It is too vague to presume that Egan would know that it should include those drains as part of what Mr. Monahan perceived to be a luxury. Egan will be allowed $22,621.15 on Change Order 28 as part of its allowed claim.

**2.  Incomplete/Unacceptable Work**

MC2 claims off-sets for certain items for which it holds Egan responsible and which the court will permit, in part, as specific damages to off-set Egan's claim. They are found in Debtor's Exhibit QQ, p. 14. The following will be allowed as off-sets in MC2's favor:

Boiler start-up - $960. Egan did not perform the service and Zaragosa Plumbing was required to do it.

Trim out - $360, grey water testing ($1,920), grey water signage ($1,958) are all conceded by Egan.

Incomplete punch list - $6,648 this work needed to be completed by Zaragosa Plumbing.

Supplemental drawings - $920. Egan concedes that it did not provide those drawings.

The following costs will not be allowed as off-sets in MC2's favor:

Fire caulking - $20,635. This amount has already been reflected in Egan's revised proof of claim.

-9-

Condensate lines, switches, etc. - $32,156. This work was outside the scope of Egan's work and may not be off-set by MC2.

Additional drawings charged - $3,375. For the reasons set forth in Egan's Closing Brief (Docket No. 637 at 16:2-15) this would appear duplicative of the amounts already allowed in favor of MC2.

Additional punch list items - $27,860. For the same reasons stated in Egan's post-trial brief, supra, this appears to be duplicative as well speculative.

Marx Okubo report - $128,411.26. This report (and any charges against Egan based upon it), is speculative and not at all persuasive to satisfy the court that it represents actual monetary damages suffered by MC2 for any of the reasons set forth in that report.

In summary, MC2 will be allowed off-sets totaling $8,888 thus reducing Egan's allowable claim to $371,016.85.[5]

IV. <u>Lefco's Amended Claim</u>

Lefco filed an initial proof of claim in the amount of $190,000 but later amended that proof of claim downward to $90,663.02. Debtor's Amended Objection asserted an entitlement to off-set a 10% retention amount of $167,119. That argument, of course, has been rejected. In the alternative, Debtor argued that it had additional off-sets in the sum of $135,530.51. It arrived at that figure through its expert's opinion that actual damages attributable to Lefco originally totaled $540,680.51. That amount appeared in the Marx Okuba report, relied on by Mr. Carey. Apart

---

[5] Unlike its challenge to the Berger claim, Debtor does not argue that Egan executed releases or waivers of those claims.

-10-

from the court's lack of confidence in that report, as mentioned above, Debtor conceded that it could not hold Lefco responsible for the cost of laundry room dryer vents since Lefco had not been obligated to provide them in the first place. In its Amended Objection Debtor starts with Mr. Carey's total amount calculated by Marx Okuba, $540,680.51, then reduces that amount by $244,032 the charge for the laundry room dryer vents. Lefco's demonstrative Exhibit No. 35, however, illustrates that the proper credit in Lefco's favor because of this error should be $410,137.75 since MC2 cannot claim overhead and profit, general conditions, contingencies, permits and related fees attributable to that phase of the work.

Thus, what began as a $540,680.51 off-set is reduced down to $130,542.76. That amount exceeds Lefco's Amended Claim and therefore if those off-sets were permitted, the claim would be disallowed in full.

The problem the court has with determining what off-sets are to be permitted is that the Debtor's objections to Lefco's claim have been a moving target. When it first objected in November, 2012, it filed a Declaration of Robin Miller who set forth his claims analysis and included a number of relatively small Incomplete Contract Items and other charges.

When Debtor filed its Amended Objection it conceded that the back charges in Mr. Miller's 2012 declaration are "entirely superceded" by Mr. Carey's report (Exhibit QQ). Then in the post-trial brief Debtor summarized its contentions about Lefco's incomplete and unacceptable work. It again repeated its theory that it may simply withhold the retention amounts that have not

-11-

been paid. It then took the alternate approach of detailing the cost of remediation for Lefco's work, stating that "giving Lefco the benefit of every doubt, this amounts to at least $107,914." It cites Exhibit QQ pp. 12 and 42-50.

Exhibit QQ p. 12 repeats most of the same line items charged by Mr. Miller, totaling $10,650. The only other specific line item on p. 12 is a so-called Axis punch list summary totaling $13,253.48. That figure itself seems to have come from information prepared by Mr. Miller. Thus having been told to disregard Mr. Miller's statement, and to rely on Mr. Carey's, the court is struggling with the circularity of that argument and cannot find a basis for charging Lefco for incomplete punch list work in that amount.

Rather than try to make sense of these contentions concerning incomplete and unacceptable work by Lefco, and unlike the analyses of the Egan and Berger claims, the court is satisfied that Lefco was excused from any performance when MPCC and MC2 failed to make a material payment in early 2011. There is some confusion in the record, and the parties are not in complete agreement, as to whether Lefco agreed to receive $140,150.68 on account of its Change Order 5. One thing that is not unclear is that Lefco and MPCC agreed on a compromise related to Lefco's Change Order 5 (Lefco Exhibit 8) and Lefco was to receive $140,150.68. Debtor apparently contends that three payments made on December 3, 2010, totaling $149,393.24, satisfied its obligations under that change order. But that amount appears to be on account of an October 25, 2010, payment application submitted by Lefco. Whether the payment was on account of Change Order 5 or the October 25 application,

-12-

Case: 11-14366   Doc# 647   Filed: 12/29/14   Entered: 12/29/14 14:54:32   Page 12 of 17

one or the other amount went unpaid. If that payment was made, Lefco's receipt of $149,333.24 may have satisfied that obligation but did not satisfy its payment application of October 25, 2010. As pointed out by Lefco in its post-trial brief, Debtor conceded as much at trial by acknowledging that if there was substantial payment breach, no counterparty was obligated to continue to perform.

Simply stated, MPCC's nonpayment of no less than $140,150 constitutes a material breach excusing Lefco's performance. Under these circumstances, particularly in light of the inability to quantify specific charges against Lefco, the court will allow Lefco its claim in the full amount of $90,663.02.[6]

V. <u>Berger's Claim</u>

Berger's claim that it filed on March 30, 2012, is in the amount of $792,257.58. That is the same amount Debtor used in its Amended Objection to Claim No. 27 of Berger Brothers, Inc. (Docket No. 596). However, in its post-trial Closing Brief (Docket No. 638) Berger includes an exhibit that summarizes its claim based upon the initial contract amount, approved change orders, further adjustments by stipulation or otherwise, leaving unpaid a total of $667,308.95. In its post-trial brief, Debtor faults Berger with a math error in its favor of $113,074.90. Applying the alleged error to the proof of claim as filed results in a total of $679,192.68. The court is unable to straighten out this confusion. In the interest of a final resolution of this dispute, the court will use Berger's slightly lower figure of $677,308.95

---

[6] Unlike its challenge to the Berger claim, Debtor does not argue that Lefco executed releases or waivers of those claims.

-13-

(the difference is less than $2,000).

Debtor's objections break down into broad categories including improper change orders, Berger's apparent release of claims, incomplete/unacceptable work, and delay damages. There are no "punch list" offsets asserted against Berger. The court has already disposed of the delay damages asserted by Debtor and will not repeat them here.

**1. Change orders.**

After a thorough review of the evidence in support of or opposition to the remaining Berger Brothers' change orders (p. 31 of Berger's Post-Trial Closing Brief) and Debtor's opposition, the court disposes of them as follows:

| Berger C.O. | Amount | Disposition |
| --- | --- | --- |
| 3 | $ 1,108.94 | Allowed, not chargeable against Berger. Authorized by MPCC representatives. |
| 4 | $ 1,984.20 | Allowed, not chargeable against Berger. Authorized by MPCC representatives. |
| 5 | $ 1,069.62 | Allowed, not chargeable against Berger. Authorized by MPCC representatives. |
| 6 | $   745.13 | Allowed, not chargeable against Berger. Authorized by MPCC representatives. |
| 7 | $16,844.05 | Disallowed. Berger was to make up for these premium time charges. |
| 10 | $81,201.73 | Allowed. Authorized by MPCC representatives. |
| 10R1 | $37,482.03 | Allowed. Delta 7 change. |
| 13 | $28,427.00 | Allowed. Not in original Berger bid. |
| 19 | $ 1,613.04 | Allowed. Not in original Berger bid. |
| 25 | $14,883.00 | Allowed. No specific challenge in Debtor's evidence. |

| | | |
|---|---|---|
| 26 | $ 1,054.84 | Allowed. Not in original Berger bid. |
| 28 | $14,101.00 | Allowed. No specific challenge in Debtor's evidence. |
| 29 | $ 9,811.82 | Allowed. No specific challenge in Debtor's evidence. |
| 32 | $ 1,502.00 | Allowed. Not in original Berger bid. |
| 40 | $ 3,183.71 | Disallowed. Berger was to perform this framing. |
| 43 | $35,000.00 | Allowed. MPCC changed subcontractor's requirements. |
| 54 | $ 6,117.01 | Allowed. Work performed at MPCC's request. |
| 57 | $ 9,336.60 | Allowed. Not in original Berger bid. |
| TOTAL DISALLOWED | $20,027.76 | |

**2. Berger waivers and releases.**

Debtor contends that Berger waived its right to assert certain amounts because it executed various versions of a Conditional Waiver and Release Upon Progress Payment and Interim General Release (see Exhibit A to Amended Objection to Claim No. 27 of Berger Brothers, Inc. (Docket No. 596)).

The court rejects this contention for two reasons. First, some of the forms of Conditional Waiver and Release are confined to a release of "any mechanic's lien, stop notice, or bond right the undersigned has on the job...." The same document specifically "does not cover any retentions retained before or after the release date" nor does it "otherwise affect the contract rights, including rights between the parties to the contract based upon a decision, abandonment, or breach of the contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment or material covered by this release if

-15-

that furnished labor, services, equipment, or material were not compensated by the progress payment." Thus such a release is of no consequence to Berger's assertion of an unsecured claim in this case.

The form of Interim General Release that Berger executed sometimes reserved claims and sometimes did not. For example, Debtor's Post-Trial Brief, Exhibit A, p. 6 made reference to attachment A (not included in the Brief) and p. 10 and 11 had no such reservation. But Berger's own trial exhibits included Exhibits 21-91 and 21-92, an Interim General Release signed on April 21, 2010. Reserved from that Release are the items on an attachment that includes what appear to be all of the Berger's change order requests that remain in dispute. Further, Exhibit 21-94, another Interim General Release, reserved on attachment A not only numerous Berger change order requests but also retention amounts.

In sum, by the plain words of some of the releases relied on by Debtor, there was no release of claims; as to the remaining releases, Berger properly reserved its right to assert the balance remaining unpaid on its proof of claim.

**3. Incomplete/unacceptable work.**

In its post-trial brief Debtor states that there was a large amount of water damage caused at the Project because of Berger's defective work, citing Exhibits QQ, p. 13. The brief goes on to state that there were a number of other problems with incomplete and unacceptable work, adding up to off-sets of $266,138.14. The water damage is identified in Exhibit QQ and it totals $20,005.60. As Berger has not provided an adequate response to that complaint,

-16-

the court will reduce Berger's claim by that amount.

The larger figure relied on by the Debtor has not been located in Debtor's exhibits so the court cannot verify it. Going further, in contending that there were various other items withheld by Berger such as stamped structural plans, final permitting, etc., Debtor refers to the "difficulty of quantifying the cost of this very material breach." Debtor's post-trial brief at 26:20-21. Accordingly, Debtor contends that it can simply withhold the retention of $355,431.62. The court has already rejected the argument that the retention is a liquidated damage amount.

In summary, MC2 will be allowed off-sets totaling $40,033.36, thus reducing Berger's allowable claim to $637,275.59.

VI. Disposition

The court is concurrently issuing separate orders allowing Claimants' proofs of claim in the amounts set forth in this Memorandum Decision.

**END OF MEMORANDUM DECISION**